# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In re:

SARAH BETH KOPERSKI,                          ORDER OF ABSTENTION
                                              AND DISMISSAL WITHOUT
            Debtor.                           PREJUDICE (COUNTS I - VI)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STEVEN LOOS,

            Plaintiff,                        BKY 14-34936

v.                                            ADV 15-3033

SARAH BETH KOPERSKI,

            Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

At St. Paul, Minnesota
November 5, 2015.

This adversary proceeding was commenced in the Defendant's bankruptcy case under Chapter 7. Earlier in 2014, the Defendant and the Plaintiff had been in litigation in the Minnesota state courts. The Defendant filed for bankruptcy before that matter went to trial. For her bankruptcy filing, the Defendant scheduled an unsecured debt in favor of the Plaintiff. She recited its amount as "Unknown" and its nature as "Legal Damages."

Through this adversary proceeding, the Plaintiff seeks two forms of relief. Under federal bankruptcy law, he seeks a determination of nondischargeability--that is, an exception from discharge for the debt that he alleges the Defendant owes him. The Plaintiff also requests that this court fix and liquidate the debt, on the same claims that were in suit in the Minnesota state courts.

The Plaintiff cites 11 U.S.C. § 523(a)(6) for his theory of nondischargeability. In his words, the Defendant owes him "a debt . . . as a result of [the] Defendant's willful and malicious conduct and injury to [the] Plaintiff." Under legislative history and judicial construction, this basis

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *11/05/2015*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

for nondischargeability aligns with the notion of intentional tort.[1]  *Kawaauhau v. Geiger*, 523 U.S. 57, 64 and 61-62 (1998); *In re Patch*, 526 F.3d 1176, 1183 (8th Cir. 2008); *In re Long*, 774 F.2d 875, 879 (8th Cir. 1985) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 79 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 365 (1977)); *In re Duy*, 484 B.R. 742, 750 (Bankr. D. Minn. 2012).  Here, the specific torts are identified as defamation; libel; invasion of privacy; and negligent infliction of emotional distress.  The Plaintiff also seeks prospective injunctive relief against the Defendant, to restrain certain described conduct.

Two questions jumped out from this matter, as it stands under the pleadings.  The first is whether this court should abstain from hearing and determining liability, damages, and right to injunctive relief under non-bankruptcy law, in favor of returning those matters to the Minnesota state court.  If abstention is warranted, the next question is the order of suit: is it more appropriate to abstain and remand now, with a later return to the forum of bankruptcy for a determination of nondischargeability if the Plaintiff prevails in the state court?  Or should dischargeability be determined first?

The court raised these matters *sua sponte* at a scheduling conference[2] and directed briefing.  Briefs have been submitted; and so these difficult issues are now addressed.  The Plaintiff appears by Dominique J. Navarro.  The Defendant appears by David L. Friedman.

---

[1]The language of § 523(a)(6) is brief, and the judicial interpretation is very much to the point of the language:

> A discharge under [11 U.S.C. §] 727 . . . does not discharge an individual debtor from any debt--
>
> . . .
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . .

[2]Discretionary abstention may be raised by the court *sua sponte.  In re Gober*, 100 F.3d 1195, 1206-1207 n.10 (5th Cir. 1996); *Bricker v. Martin*, 265 F.Appx. 141 (3d Cir. 2008).  As long as the parties have had an opportunity to brief the issue or otherwise be heard, the bankruptcy court may address and rule on the appropriateness of abstention after raising it *sua sponte.  In re Gober*, 100 F.3d at 1206-1207 n.10.

## MATTERS IN SUIT, HERE AND THERE

These parties' disputes are truly a 21st-century tale.  In his complaint for this

adversary proceeding, the Plaintiff makes the following allegations, among many others:[3]

1.  The Plaintiff and the Defendant were married for about five years.  They got divorced on November 23, 2005.  They have one child together.  They both reside in Rochester, Minnesota.

2.  The Defendant wrote a novel titled *The Narcissist's Wife*.  She published it under a pseudonym in the summer of 2013.  The Defendant began to distribute copies of the novel by various means, including a weekly book club and through Amazon.com and other on-line vectors.

3.  Recipients of the book have included multiple persons in the Rochester community.

4.  The novel "contains several false, misleading, and defamatory statements and assertions of fact regarding [the] Plaintiff, of which facts [the Defendant] knew were false . . . ."  The subject matter includes events, acts, and interpersonal conduct during the parties' marital relationship; the Plaintiff's mental health; the Plaintiff's relationship with the parties' child; and the Plaintiff's lawfulness and moral character.[4]

5.  During the fall of 2013, the Defendant posted an untrue statement on her Facebook wall, to the effect that she "[w]as just asked to move to Denver with my ex-husband . . . ."

6.  The "[r]ecipients and readers of the [novel] and [the Facebook] Posting are aware that they each contain assertions about and concerning [the] Plaintiff."

7.  The identified statements are false.  The Defendant "intentionally, willfully, and maliciously wrote, published, and distributed"

---

[3]This is only a summary of the salient parts of the Plaintiff's *pleading*.  There are no findings of fact here.

[4]The details are omitted here.  Enough is enough.

them "with the intent to ruin [the] Plaintiff's reputation in the community," and "in order to cause injury to [the] Plaintiff . . . ."

8.   The Plaintiff has incurred "great injury to [his] reputation and character," has undergone "severe emotional and psychological distress," and has incurred "damage to his business, business reputation, and business prospects."

In January, 2014, the Plaintiff commenced suit against the Defendant in the Minnesota State District Court for the Third Judicial District, Olmsted County.  The pleading of fact for that earlier action was almost identical to that just summarized for this adversary proceeding.[5] Other, non-summarized fact allegations are also common to the two complaints.

In the Olmsted County District Court lawsuit, the parties skirmished through early motions from both sides.  The Defendant moved for summary judgment (granted as to the Plaintiff's claim for intentional infliction of emotional distress, denied as to all the rest).  The Plaintiff moved for a temporary injunction against any further act to disseminate *The Narcissist's Wife* in any way (granted, with consideration of a permanent injunction reserved to trial on the merits).[6]  The Plaintiff moved for leave to assert a claim for punitive damages.[7]  The Defendant did not oppose the motion and the court granted it.  After the Plaintiff's counsel served a second round of written discovery on the Defendant and received leave to take her deposition a second time, the Defendant filed her bankruptcy petition on December 16, 2014.

Some six weeks after that, the Plaintiff moved for relief from the automatic stay of 11 U.S.C. § 362(a)(1).

---

[5]The amended complaint in the state court action is part of the record in BKY 14-34936, Dkt. No. 14, Exh. C.  That docket entry is associated with a motion by the Plaintiff for relief from stay--about which, more, momentarily.

[6]The state-court's 20-page order and memorandum on both motions are also a part of the record in BKY 14-34936, Dkt. No. 14, Exh. A.  There will be further references to the findings made by the state court in the latter document--which will be identified as "State Court Memorandum."

[7]Under Minnesota law, a plaintiff that seeks to make a claim for punitive damages cannot sue that out in its original pleading; it must make a separate motion after initiating suit.  Minn. Stat. § 549.191.

The request was quite anomalous in its content.  The Plaintiff sought leave to proceed to a jury trial in his state court lawsuit against the Defendant.  He coupled that with a request to "defer the [Defendant's] discharge pending resolution of the state court matter."[8]

In her response, the Defendant picked up on the anomaly.  She argued that dischargeability was "a preliminary bankruptcy issue that should be resolved" before any consideration of allowing the earlier suit to proceed in the state court.

The Plaintiff's motion was denied, because there was no reason to grant it as it was postured.  The Defendant was in bankruptcy, after all.  The Plaintiff's counsel had not started a proceeding for determination of dischargeability in the bankruptcy case.  Thus, had the Plaintiff gotten leave to proceed in the state court as he requested, a heavy gate would have slammed down soon after that: a grant of discharge would have imposed the permanent discharge injunction under 11 U.S.C. § 524(a)(2), against any further prosecution of the lawsuit.  *See In re Bennett*, 501 B.R. 93, 95 (8th Cir. B.A.P. 2013).[9]  There might have been one other bankruptcy-related function for proceeding in a state court after a grant of relief from stay, to fix and liquidate the debt toward

---

[8]This all seemed to be propelled by a supreme sense of rectitude: "The Plaintiff ha[d] a great chance of success on the merits" in the state-court lawsuit.

[9]Apparently, the thought behind the motion was that deferring a grant of discharge would eventually work to prevent the discharge from affecting the Plaintiff's claims, permanently and without any other action on his part other than pursuing his claims in the state court, to judgment in his favor.  That notion is an aberration from the whole structure for according relief to debtors under Chapter 7.  The Bankruptcy Code and Rules do not contemplate the deferral of a grant of general discharge for the benefit of a single creditor that asserts nondischargeability.  In fact, the statutorily-prescribed process under Chapter 7 is entirely to the opposite; it contemplates a prompt grant of general discharge in the ordinary course.  Discharge is to be granted "forthwith" once a designated (and relatively brief) period for objection has passed without the lodging of an objection.  Fed. R. Bankr. P. 4004(c)(1), with reference to Fed. R. Bankr. P. 1017(e).  This latter reference is to an *objection* to grant of *any* discharge, which is governed by 11 U.S.C. § 727(a).  An objection to general discharge is to be distinguished from a proceeding for an *exception* to discharge, which would lie in favor of a single creditor and would be styled  under 11 U.S.C. § 523(a), a dischargeability proceeding.  Coincidentally, the filing of a complaint to determine dischargeability is subject to the same deadline, Fed. R. Bankr. P. 4007(c).  Once a dischargeability proceeding is timely commenced, however, its pendency preserves the issue of dischargeability for later judicial determination notwithstanding an intervening grant of general discharge.  *See In re Anderson*, 72 B.R. 495, 496-497 (Bankr. D. Minn. 1987) (observing that the scope of discharge is final when entered; where a judicial determination of the effect of discharge on a particular debt is necessary, the relief is akin to a declaratory judgment; and where discharge is granted after the timely commencement of a dischargeability proceeding but before decision in it, "the [ultimate] relief would be a determination by the court that the debt was discharged" earlier, on the grant of discharge).  Thus, the way to raise the issue of dischargeability as to a single debt is to timely commence an adversary proceeding--not to hinder the grant of discharge otherwise to be made routinely in any case of an individual debtor under Chapter 7.

allowance of a claim in favor of the Plaintiff for the purposes of administration in bankruptcy--i.e.,

for the division of the estate by the trustee.  But there was no compelling need to do that--it was

early in the case, and there was no indication that the trustee would garner assets of a value large

enough to justify an early effort toward allowance of disputed claims.

The ruling was not a hint, but the Plaintiff's counsel took one anyway.  This

adversary proceeding was commenced, timely, about two weeks after that.  This proceeding is a

close repleading of all of the claims under state law already in suit (in Counts I - VI of the

complaint), with the tack-on of a request to have any adjudicated debt determined

nondischargeable in bankruptcy (in the lonely Count VII).

After the Defendant filed an answer, a scheduling conference under Fed. R. Bankr.

P. 7016 was ordered and convened.  Both sides' lawyers participated.  Their input reflected their

tacit assumption that all pleaded issues would be litigated and tried in the federal bankruptcy forum,

and to the court.[10]  When queried about the number of contemplated witnesses and the possible

length of trial, the Plaintiff's counsel blithely responded that he "would contemplate [calling] 20 to

25 witnesses" for his client's case alone.  He expected a trial of at least five days in length.  The

Defendant's counsel was not quite so expansive; he anticipated "no more than three or four

witnesses" for his client, and "the shortest trial possible."  When posed the same questions for a

trial presentation on dischargeability alone, the answer was somewhat more moderate.  The

Plaintiff's counsel "could back it down to ten [witnesses], to be honest."  The Defendant's counsel

did not have a different answer.

The vexing thing was, there was some basis for projecting a lengthy trial for either

instance.  Arguably, a prima facie case under § 523(a)(6) would require threshold findings on the

de facto infliction of an "injury by the [Defendant] to" the Plaintiff or to his property, in addition to

---

[10]By the time the scheduling conference was convened on June 10, 2015, the time for either side
to have preserved a right to jury trial had expired.  The Plaintiff did not demand trial by jury in the text of
his complaint here.  The last pleading directed to any of the Plaintiff's claims under common law was the
Defendant's answer, filed on April 3, 2015.  The 14-day period for demand ran from the date of that filing.
Fed. R. Civ. P. 38(b)(1), *as incorporated by* Fed. R. Bankr. P. 9015(a).

findings on an associated intent of the sort identified in the statute.  The Plaintiff alleges injury to

personal attributes that are mostly intangible--reputation, community standing, privacy, emotional

balance.  Findings on an "injury" in the bankruptcy-law sense might well require the same broad

proof of wide publication and reduction in community standing that the law of defamation would

require for liability in tort.  In fact, the inquiries on this threshold issue were likely to coincide almost

exactly.  The *amount* of proof that the Plaintiff proposes to adduce for either level of complexity

might be overkill; but the *type* of proof is probably to be the same.  The legal dimension--whether

the Plaintiff had suffered a material injury to his personal reputation and community standing--is

also likely to overlap heavily.

       The prospect was obvious: either way, the parties would put on a lengthy trial in the

forum of bankruptcy, over involved and intensely personal subject matter, governed by complex and

specialized state law . . . as to which the presiding judge would have absolutely no expertise at all.[11]

The ultimate decision-making would require an extent of harm to be gauged and an amount of

damages to be liquidated, all on intangible injuries to abstract legal rights but by a distanced fact-

finder lacking familiarity with the community in which personal ties, trust, and standing were alleged

to have been invaded and sundered.  A heavy dose of specialized state law would exclusively

govern six out of seven pleaded counts for relief.  The Plaintiff was alleging injury and harm inflicted

through the use of multiple, recently-developed, but now-ubiquitous means enabled by modern

technology: self-publishing, Internet-based retailing with posted product endorsement, topic-specific

websites, social media.  He was alleging specific resultant harm to his engagement in a "consulting"

business, a latter-day occupation quite loosely defined by nature and function in general

---

[11]After all, this litigation is not governed by the bodies of state law applicable to consumer or
commercial finance, those legal authorities most relevant to the underlying phenomenon of insolvency:
many parts of the Uniform Commercial Code; the Minnesota enactment of other uniform laws including the
fraudulent transfer statutes; statutes regulating partnerships and artificial business entities; the law of
mortgages and mortgage foreclosure; and the like.  Even these bodies of law do not come up every day,
or every week, on a bankruptcy judge's docket; but they come up often enough that conversance is
developed and sensitivity to nuances of local application is maintained.  But, the common law of
intentional tort, as rapidly as some parts of it have developed in state jurisprudence in recent times?
Almost never; and hence a large dark expanse facing a bankruptcy judge, who might have to apply it (as
here) to a sharp, hyper-personalized context.

understanding, whether in the business context or in the law.  The uncertain fit of more traditional,

locally-evolved legal concepts to these new circumstances promised significant challenges to the

decision-maker who would have to apply state law to these parties' disputes.  Of those, the most

salient ones are the element of publication in the law of defamation and the whole idea of a privacy

right protectible against invasion--both of those to be gauged for events that took place in a world

awash in electronic media.  And there are more.

## DISCUSSION

This all posed a large question:  is the bankruptcy court the appropriate forum to

hear and determine such emergent issues of state law, where it as a federal forum is specialized

in a very different body of law?  This question is channeled and answered through the statutory

structure for abstention.

### Abstention: Governing Legal Principles

For proceedings within bankruptcy cases, abstention is governed by 28 U.S.C.

§ 1334(c).[12]

The relevant text of 28 U.S.C. § 1334(c) provides:

> (1) . . . nothing in [28 U.S.C. § 1334] prevents a
> district court in the interest of justice, or in the interest
> of comity with State courts or respect for State law,
> from abstaining from hearing a particular proceeding
> arising under [the Bankruptcy Code] or arising in or
> related to a case under [the Bankruptcy Code].

> (2) Upon timely motion of a party in a proceeding
> based upon a State law claim or State law cause of
> action, related to a case under [the Bankruptcy Code]
> but not arising under [the Bankruptcy Code] or arising

---

[12]The following is noted to make this point by a distinction.  As the fundamental framework for the application of bankruptcy remedies under statute, bankruptcy *cases* present a different situation.  A bankruptcy *case* is not subject to abstention pursuant to 28 U.S.C. § 1334(c); the adjudication of bankruptcy's own issues under federal law may not be shunted en masse to another court once initiated in the federal forum.  The major reason is that the federal courts have exclusive jurisdiction over bankruptcy *cases*.  28 U.S.C. § 1334(a); *In re Skyline Woods Country Club*, 636 F.3d 467, 471 (8th Cir. 2011); *In re Le*, 537 B.R. 913, 917 n.12 (Bankr. D. Minn. 2015).  At most, a bankruptcy case and its fundamental processes may be dismissed or suspended in favor of adjusting the full debtor-creditor relationship under some other legal process or some alternate substantive law.  11 U.S.C. § 305(a).  *See* Richard I. Aaron, BANKRUPTCY LAW FUNDAMENTALS, § 3.6 at 152 (2015 ed.).

> in a case under [the Bankruptcy Code], with respect
> to which an action could not have been commenced
> in a court of the United States absent jurisdiction
> under [28 U.S.C. §§ 1334(a) - (b)], the district court
> shall abstain from hearing such proceeding if an
> action is commenced, and can be timely adjudicated,
> in a State forum of appropriate jurisdiction.

Getting down to the application of the statute, this is not a matter for mandatory abstention under 28 U.S.C. § 1334(c)(2).  Under current circuit precedent, a request to fix and liquidate the liability on a debt asserted to be nondischargeable is a core proceeding, 28 U.S.C. § 157(b), within the bankruptcy jurisdiction of 28 U.S.C. § 1334(b).  Such a request may be heard in tandem with the matter of dischargeability and it is subject to final disposition at the order of a bankruptcy judge.  *In re Ungar*, 633 F.3d 675, 679-680 (8th Cir. 2011).  Mandatory abstention under 28 U.S.C. § 1334(c) lies only for so-called "related proceedings" in bankruptcy.  Under *In re Ungar*, Counts I - VI of the Plaintiff's complaint are *not* related proceedings; and because they are core proceedings mandatory abstention does not apply to them.  *In re Williams*, 256 B.R. 885, 893 n.4 (B.A.P. 8th Cir. 2001).

The only authority under which abstention would apply to this matter, if at all, is the permissive, or discretionary variant under 28 U.S.C. § 1334(c)(1).  Discretionary abstention may be applied to either core proceedings or related proceedings.  *In re Gober*, 100 F.3d at 1206-1207.  Under it, the court's power to abstain is statutorily limned by a short list of considerations, tersely worded but conceptually broad.  They have been described as "only general standards for determining whether abstention is appropriate."  *In re Williams*, 256 B.R. at 893.  There is not much case law, trial-level or appellate, on their application or construction.[13]

---

[13]There is good reason for that:

> Any decision to abstain or not to abstain made under [28 U.S.C.
> § 1334(c)] (other than a decision not to abstain in a proceeding described
> in [28 U.S.C. § 1334(c)(2)]) is not reviewable by appeal or otherwise by
> the court of appeals under [28 U.S.C. §] 158(d), 1291, or 1292 . . . .

28 U.S.C. § 1334(d).  The first enactment of 28 U.S.C. § 1334(d) had a flat-out bar on appeal: "Any decision to abstain made under this subsection is not reviewable by appeal or otherwise."  Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, § 101(a), 98 Stat. 333 (1984).  In 1990 the bar was narrowed to the present scope: one may not appeal a decision on abstention to the

There is some local authority, however.  The Bankruptcy Appellate Panel for the Eighth Circuit has articulated a standard for judicial consideration with "a number of factors that may be considered"--twelve, at minimum, outlined with commensurate ponderousness.  *In re Williams*, 256 B.R. at 894.  *See also In re Refco, Inc.*, 354 B.R. 515, 522 (B.A.P. 8th Cir. 2006); *In re Foss*, 328 B.R. 780, 783 (B.A.P. 8th Cir. 2005).

This sort of multi-factored "test" prompts too much turgid argument from lawyers and too much rote analysis from judges.  More to the point here, when used for discretionary abstention such framings put too much focus on the centrality of the subject proceeding to the administrative process in bankruptcy, no matter what the governing substantive law.[14]  Bluntly put, *Williams* takes too little heed of the federalism-centered values voiced in the plain language of the statute--"respect for State law," motivating "comity with State courts" and manifested by a deference to the state courts' superior role in construing, applying, and developing the substantive law of their own forum.

In a pre-*Williams* opinion, the Eighth Circuit gave more pointed service to this facial function of discretionary abstention than the Bankruptcy Appellate Panel did later:

> Where a state court proceeding sounds in state law and bears a limited connection to [a] debtor's bankruptcy case, abstention is particularly compelling.

---

circuit court of appeals.  Judicial Improvements Act of 1990, Pub.L. No. 101-650, § 309(b), 104 Stat. 5089, 5113 (1990).  This means that on-point appellate case law reviewing the merits of a bankruptcy court's decision on abstention has been issued only since 1990, and only by tribunals on the first rung of appeal-- the federal district courts and the bankruptcy appellate panels.

[14] *Williams* certainly does this: at least five of its dozen identified "factors" arguably go to the administrative process in bankruptcy, such as "the efficient administration of the [bankruptcy] estate"; alternate bases for federal jurisdiction over the matter; the feasibility of severance and subsequent enforcement of all judgments by the bankruptcy court; "the burden on the bankruptcy court's docket," and so forth.  No question, some consideration of the relationship of a given proceeding to bankruptcy's judicial and administrative processes is appropriate.  The Eighth Circuit itself has acknowledged the "promo[tion] or impair[ment of] efficient and fair adjudication of bankruptcy cases" as a consideration on discretionary abstention.  *In re Reeves*, 65 F.3d 670, 675 (8th Cir. 1995) (quoting *In re Salem Mortg. Co.*, 783 F.2d 626, 635 (6th Cir. 1986)).  There will be situations where a particular proceeding is governed by unsettled state law and a bankruptcy court's retention of it might be necessary to promote the rehabilitative goals of bankruptcy or the preservation or enhancement of asset value for debtor and creditor alike.  However, the ostensible needs of the bankruptcy process should not dictate the outcome on discretionary abstention without recognizing the express statutory considerations.

*In re Titan Energy, Inc.*, 837 F.2d 325, 332 (8th Cir. 1988) (citation omitted).[15]  *See also In re*

*Reeves*, 65 F.3d at 675 (observing that a trustee's ability to bring about the involuntary liquidation

of a corporation in order to realize on the bankruptcy estate's minority equity interest in it was a

matter of Arkansas state law; opining that "[a]n Arkansas court may well be the best forum" to apply

that law in evaluating the assertions of mismanagement and oppression of minority shareholders

on which the trustee sought involuntary dissolution).  The comity-supportive, federalism-centered

function of discretionary abstention was recognized early in this district, as well--even before the

Eighth Circuit's rulings.  *In re Arctic Ents., Inc.*, 68 B.R. 71, 77-78 (D. Minn. 1986).  *See also*

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987) (power of federal courts to abstain on

discretionary grounds "reflect[s] a complex of considerations to soften the tensions inherent in a

system that contemplates parallel judicial processes").

       The Eighth Circuit is the one appellate forum with the undeniable authority to render

authoritative precedent binding in this district.  Its rulings on discretionary abstention bring the

matter down to two essential features.

       First, a bankruptcy court may determine that particular proceedings pending before

it under the bankruptcy jurisdiction nonetheless are better decided on their merits by a state court.

This conclusion can be supported by a number of factors:  the uniqueness or complexity of

governing state law; the unsettled nature of that law; the nuances of its application to fact patterns

beyond those presented for its original framing; or the proper interest of a state court in regulating

subject matter traditionally of local concern, that lacks an inherent interstate or federal dimension.

*In re Foss*, 328 B.R. 780, 784 (8th Cir. 2005) (affirming bankruptcy court's abstention from hearing

and determining debtor's contentions with state agency over nature of financial obligations relating

to his duty under state law to support his children, and dismissing adversary proceeding that debtor

---

[15]The text of *Titan Energy* does not specifically cite 28 U.S.C. §§ 1334(c)(1) for its analysis on
abstention.  However, the court clearly was treating the discretionary variant of abstention when it
emphasized the primacy of state law in the dispute before it.  It observed that the subject proceeding was
only tangential to the administrative process in the bankruptcy case before it.  And, it used the term
"permissive abstention" as its reference for this part of its analysis.  837 F.2d at 334 and n.16.

had styled as one to determine dischargeability of those obligations under 11 U.S.C. § 523(a)(18));

*In re Fifty Below Sales & Marketing, Inc.*, 490 B.R. 885, 897-898 (Bankr. D. Minn. 2013) (abstaining

from hearing and determining action commenced by purchaser of going-concern business from

bankruptcy estate that had been removed in part to federal court by defendants, because central

issues over enforcement of restrictive employment covenants under state law were unsettled under

local precedent, were subject to conflicting policy considerations, and presented local sensitivities);

*In re Holmes*, 387 B.R. 591, 601 (Bankr. D. Minn. 2008) (in action by debtors in bankruptcy to have

mortgage invalidated, abstaining from hearing and determining defendant mortgage lender's third-

party complaint against closing agent on subject financing transaction; lender's state-law claims for

breach of contract, indemnification, and negligence were contingent and were more appropriately

addressed by state court if debtors were successful in having mortgage invalidated).

Second, a federal court has a broader, discretionary authority to decline to exercise

the bankruptcy jurisdiction in favor of relegating the parties to a state-court forum, where such

considerations predominate over the more mechanical interest in retaining direct judicial control of

litigation in the service of an ongoing bankruptcy process. *In re Reeves*, 635 F.3d at 675 (pointedly

emphasized discretionary nature of power to abstain under 28 U.S.C. § 1334(c)(1)).

### Abstention: Application

On all of these considerations, it is appropriate to abstain from the full range of state-

law claims that the Plaintiff repled into this adversary proceeding--that is, Counts I - VII of his

current complaint.  This conclusion is supported by all of the relevant statutory considerations:

respect for the ongoing development of Minnesota state law in its responsiveness to changing

social conditions; comity with the state courts' role in that development; and deference to the proper

role of a local, state-court forum in addressing the specific, community-rooted substantive issues

presented by those counts of the Plaintiff's complaint.  A judge in the specialized federal forum of

bankruptcy is not statutorily charged with expertise in the sensitive legal governance here, and is

not at all likely to have actually gotten such expertise from experience on this bench.  By contrast,

a trial-court judge in the Minnesota state courts of general jurisdiction is both charged with familiarity in the substantive law of that forum, and is far more likely to have developed the expertise and sensitivity required to address these claims in compliance with that law and in a localized context.

Those are the more broad-brushed considerations, stemming from the larger structure of divided sovereignty in the American sense of federalism.  They build out from there, using the specific incidents of the matter at bar.

First, the Plaintiff sues under the theories of defamation and libel, to redress the "lower[ing]" of his "estimation in the community, . . . ridicule . . . , and . . . personal humiliation"--all of which he alleges were consequences of the issuance of *The Narcissist's Wife* and the posting of the Facebook entry.  Under Minnesota law, the alleged "damage[ ] and injur[y] in [the Plaintiff's] respective [sic] character and reputation" and the "damage to his business, business reputation, and business prospects" would be gauged by a finder of fact--primarily in light of the very communities in which the Plaintiff lives and works.  *E.g.*, *Gadach v. Benton County Co-op Ass'n*, 53 N.W.2d 230, 232 (Minn. 1952) (allegations in published article are actionable as libel where they "imputed to plaintiff a crime, or . . . held him up to public contempt, injured his reputation, and lowered him in the confidence and respect of his neighbors"); *Longbehn v. Schoenrock*, 727 N.W.2d 153, 160-161 (Minn. Ct. App. 2007) (where plaintiff was "commonly known in [his local] community by [a particular] derogatory nickname" and plaintiff did not prove that defendant "originated the name or participated in its dissemination" in that community, defendant could not be held liable for defamation).

To be sure, such findings must be made only on evidence properly received at trial. It would not be proper for a locally-based fact-finder to make them on a broader sense of a community's mores and standards derived from the fact-finder's personal experience.  Yet it can not be denied, a resonance with the social and cultural norms of the relevant community would be a valuable attribute to bring to the evaluation of liability, and particularly to the matter of damages.

13

At a more basic level, it could aid an assessment of the credibility of all witnesses' testimony.  So, too, it would be valuable for a presiding jurist to have an experienced-couched appreciation of the values of the local common law, as embodied in the forum state's protections for personal reputation--whether in making findings of fact or in making rulings of law.

And, lest that seem to evidence predilection, let it be noted: these considerations do not invariably cut in predisposition toward a plaintiff in a defamation case.  A locally-grounded fact-finder might well reject a plaintiff's claim of defamation if the subject matter of the alleged statement were not such as to besmirch in the particular social milieu where it was published.[16]  In either instance, a fact-finder who knew the subject community would be better-equipped to evaluate the credibility and probity of evidence on community standards, social standing, and the actual effect of a published statement in the community of publication.

Respect for the peculiarly personal, intangible orientation of the tort alleged, thus militates in favor of a local, general-jurisdiction court hearing and deciding such issues, whether through judge, jury, or both.

Second, the relative novelty of factual and legal subject matter weighs in favor of adjudication in the home-forum for the governing law, the Minnesota state courts.  The Plaintiff's fact-pleading features so many new phenomena, none of which existed before the last quarter-century.  Their implications have not been treated to any meaningful degree in extant, governing case law.

For instance, publication is an essential element of any cause of action for defamation.  *E.g.*, *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410-411 (Minn. 1994) and *Lewis v. Equitable Life Ass'ce Soc'y*, 389 N.W.2d 876, 886 (Minn. 1987) (to be defamatory, "a statement must be communicated to someone other than the plaintiff"); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980) (citing RESTATEMENT (SECOND) OF TORTS §§ 558-559

---

[16]This is just what happened in *Longbehn v. Schoenrock*--though admittedly on an individualized basis, rather than from a more general sense of what is considered good or bad, honorable or dishonorable, in the locality.

(1977) for elements of defamation, including publication in the sense of communication to a third party).  Here, the possible vectors of a defamatory publication were several and their new forms and processes potentially impact every aspect of the claims and defenses in suit between these parties.

First, there was the relative ease and cheapness of memorializing statements in hard-copy book format through self-publishing, itself enabled by digital composition, layout, and typography and inexpensive printing and binding.[17]  This makes a book-based form of communication far cheaper, and more ready and available, than the "vanity publishing" industry did in the mid-20th century.[18]  Second, for the resulting printed work, there was the facilitation of product distribution through e-commerce.[19]  Then, as to the allegations of publicity and facilitated dissemination for the book, there is the usual want of outside editing, verification, integrity-checking, and fraud control for most user-posted communication through commercial and non-commercial websites and social media.[20]  Finally, there is the very quick, often instantaneous access to communication disseminated through electronic means, and even to print-format communication delivered quickly by sellers in e-commerce.

---

[17]"Defendant self-published [*The Narcissist's Wife*] on Amazon.com under the pseudonym Jamie Bethany."  State Court Memorandum, 1.

[18]"Vanity press" and "vanity publisher" are traditionally defined as "a press that publishes books at the author's expense."  WEBSTER'S NEW THIRD INT'L DICTIONARY, 2532 (2002 ed.).  By contrast, the more recently-coined term "self-publish" is defined as "to publish (a book) using the author's own resources." WEBSTER'S NEW THIRD INT'L DICTIONARY, 129a (2002 ed.).  The difference between the two revolves around the performance of traditional vanity publishing by a formal, third-party publisher-entity that "creates bound copies of books for authors for a fee."  A vanity publisher provides a "full-service publishing experience" with layout and composition, issuing books under a formal imprint.  All this is provided at greater expense.  By contrast, modern self-publishing is potentially much less expensive and probably produces the product more quickly.  It is the process by which an author publishes his or her own work without a publisher's imprint on the book and "directly into the trade marketplace," self-exploiting digital technologies for layout, composition, and customized printing-on-demand.  *See, in general*, Valerie Peterson, "Vanity Presses vs Self-Publishing Service--Publishing Your Own Book," **http://publishing.about.com/od/SelfPublishingAndVanity Presses/a/Vanity-Presses-And-Self-Publishing-Ways-To-Publish-Your-Own-Book.htm** (last consulted Nov. 4, 2015).

[19]"[*The Narcissist's Wife*] was available for purchase in both physical and electronic form on Amazon.com from approximately September 2013 until November 2013 and sold around 40 copies." State Court Memorandum 1; also 13.

[20]"Defendant reviewed and recommended the Book on multiple websites, including Pinterest, Facebook, and goodreads.com.  Friends of Defendant also reviewed and recommended the Book online." State Court Memorandum, 1; also 10.  The state court did not specify whether the Defendant posted her self-reviews under her true name or her *nom de plume*.

Arching over it all is the huge roil between jejune gullibility and corrosive skepticism that seems to run across the e-consuming public worldwide.  In less than a decade, a serious, bona fide debate has blossomed in academic and political circles alike, over whether there still is--or even could be--a justifiable claim to a public reputation grounded fairly in reality, or a true personal privacy of the traditional understanding, in a world that battens on such phenomena with a voracity and reactivity that constantly escalate.

The tort of invasion of privacy, identified as such, was not even recognized in Minnesota until 1998.  *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 236 (Minn. 1998).  *See also Bodah v. Lakeville Motor Express, Inc.*, 663 N.W. 2d 550 (Minn. 2003).  With one lone exception, Minnesota state jurisprudence has not yet addressed the consequences of the advent of 21st-century electronic media on the structure of the law of defamation and invasion of privacy.  *See Yath v. Fairview Clinics, N. P.*, 767 N.W.2d 34, 35 (Minn. Ct. App. 2009) (acknowledging that "some public webpages might get little actual attention," but holding that defendant's "unrestricted MySpace.com webpage posting . . . constitutes publicity" toward proof of elements of claim for invasion of privacy).

The ruling in *Yath* is significant.  But it cannot be said that the Minnesota appellate courts have treated the complex of issues implied by recent technological development, in any comprehensive way.[21]  The point remains, nonetheless: even with such large recent changes in our society the law under these rubrics must still function to protect the expectations of Minnesota's citizens for the integrity of these facets of their lives and beings.  It is far more proper to have the courts of that state address these emergent tensions, as directly attuned as those courts will be to

---

[21]In the only other extant treatment--now dated--the *Bodah* court addressed the circulation of 206 persons' names and social security numbers to 16 recipients by facsimile transmission under the rubric of invasion of privacy.  663 N.W.2d at 552.  That technology is still used, true; and the disclosure of personal identifying information is far more a matter of legal controversy now than 2001, when *Bodah*'s cause of action was alleged to have accrued.  Nonetheless, there is a bitter poignancy on comparing what was alleged to have happened there, to what can happen now through the hyper-exponential growth of mass technologies for e-communications.

both the traditional local principles and the rapidly-evolving conditions to which they must be applied.

The third major ground supporting abstention resonates with the same federalism-centered values, but goes to the end-result and bottom line: the liquidation of an award of damages, if the Defendant's liability in tort were fixed in favor of the Plaintiff.

To put it bluntly, the determination of damages for an adjudged injury to the person or for an invasion of rights inherent in the person is not a function that bankruptcy judges are suited for, or proficient at--as a matter of experience, expertise, and predilection *or the lack of them*. It is a matter of simple human nature: lawyers attracted to this bench are *not* those who have specialized in the law of personal injury, or have engaged in a general tort practice from the plaintiff's side or the defense. They have not ground at the mechanical aspects of liability and damages, through individual case after individual case, to get an intuitive grasp of the balanced reasonableness that such award should embody.

This is simple reality--despite the fact that the liquidation of claims for allowance against bankruptcy estates is a frequent task for bankruptcy judges, across a standard docket. In bankruptcy, that task is most often a humdrum exercise directly related to the objective abstractions of credit and commercial activity: the determination of amortized principal, the calculation of appropriate interest and associated, contractually-recoverable costs; the identification of lost profit from frustrated transactions; the quantification of reduced value for goods or fixed assets that are damaged, destroyed, or obsolesced.

To opposite effect, determining a proper amount of compensation for injury tortiously inflicted on a unique, individual person is not naturally within the career exposure, skill-set, or comfort range for a member of this bench. In fact, under the statutory structure for jurisdiction and

judicial authority over bankruptcy cases and proceedings, it is not likely that a bankruptcy judge

would ever gain such a conversance through experience on the bench.[22]

Under the immemorial tradition of the common law in the Anglo-American system,

there is a forum and an institutional structure to which the task of determining damages is

customarily committed: the jury, or the judge in a general-jurisdiction civil court if the right to a jury

trial is waived.  Individually, members of a jury may have no more intrinsic expertise on the matter

of damages than a judge on a specialized, commercially-oriented court does; but it is to the jury that

our system has always committed the task, subject to guidance from a presiding judge.  Any

medium-tenured judge on a court with general jurisdiction over tort matters is likely to have hard-

---

[22]The Judicial Code provides:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

28 U.S.C. § 157(b)(5).  This interlocks with the exclusion of such proceedings from "core proceeding" status in bankruptcy:

> Core proceedings include, but are not limited to--
>
> . . .
>
> > (B) allowance or disallowance of claims against the estate . . . , and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of [the Bankruptcy Code] *but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under* [the Bankruptcy Code] . . .

28 U.S.C. § 157(b)(2)(B) (emphasis added).  These provisions have been part of the statutory structure for jurisdiction and judicial authority since their enactment in 1984.  Pub.L. No. 98-353, title I, § 104(a), 98 Stat. 333, 340-341 (1984).  The consequence seems to be that the fixing and liquidating of personal injury and wrongful death claims against a bankruptcy estate is to be conducted by a district judge in the federal district court.  Collier on Bankruptcy P 3.06 (Alan N. Resnick and Henry J. Sommer eds., 16th ed.).  Given the non-core status, and the statutory commitment of the process to the forum of the district court, a bankruptcy judge may not have the authority to hear and determine such claims, at all.  (The Eighth Circuit has not spoken to any of this, so these observations are not expressed in the categorical.  A small number of other circuits have applied these provisions.  There is some confusion among the alternate outcomes on forum-court that they have directed.  *See* Richard I. Aaron, BANKRUPTCY LAW FUNDAMENTALS, § 3.5, at 147-148.)

gained familiarity with the structuring and limiting principles of the law of damages, so as to inform the jury's determination through instructions.

The end-result of a ruling in favor of the Plaintiff in this matter would be a determination of damages. For that crucial part of the process, it would be appropriate to abstain in favor of the parties going ahead in Olmsted County. This would reflect a respect for that traditional forum on this sort of controversy, and a deference to that forum as the institutional structure to which the issue is committed in our system.

Finally, there is one more reason for abstention. Although it is subordinate to the others, giving it effect would also defer to the Minnesota state courts' prerogatives in relation to the Plaintiff's claims and the Defendant's defenses.

Counsel have advised that their litigation in Olmsted County had not gotten to the stage of the mediation process that is currently mandated for most actions under the civil jurisdiction in the Minnesota state courts.[23] The Plaintiff's counsel states that his client is ready to go through that.[24] At the scheduling conference in this adversary proceeding, the Defendant's counsel similarly endorsed the notion of mediation. However, he rather hopefully suggested a referral to one of the other members of this court's bench, for mediation pursuant to Local Rule 9019-2.

The defense's suggestion was rejected out of hand, due again to the lack of relevant experience across the membership of this bench. If a mediator has expertise in the subject matter, an assessment of the parties' respective cases can be shared to good effect. Without that, the likelihood of an effective mediation process is significantly lower. An internal referral to mediation thus bore too much risk that limited judicial resources would be ill-directed to a futile effort.[25]

---

[23]Minn. Gen. R. Pract. (D. Cts.) 114.01 (subject to designated limited exceptions, "[a]ll civil cases are subject to Alternative Dispute Resolution . . . processes"), *et seq.*

[24]Not really big of either of them, given the mandate; but still the right thing to say.

[25]On the regular stuff of bankruptcy, the bankruptcy judges of this district have had marked success in this court's in-house mediation effort over the last decade and more.

On abstention, mediation would be available--and required--in the Olmsted County District Court.  The general mandate for that was likely the result of a value-judgment, that the resolution of civil disputes under state law is better given a first try through alternate means that are less costly than full-bore litigation and trial.  Standing alone, this forum-wide predilection for mediation would not compel discretionary abstention for a proceeding that is otherwise under the bankruptcy jurisdiction.  But nonetheless, returning these parties and their controversy to the Minnesota state courts for a process that includes mediation would respect that forum's value judgment in making alternative dispute resolution mandatory.

A functional consideration supports this outcome as well.  It is more than likely that through a system of mediation developed under a general mandate, the parties could enlist a mediator with enough relevant expertise to enhance the effectiveness of the process.

For those reasons, it is warranted to abstain from hearing and determining all of the Plaintiff's pleaded claims in this adversary proceeding other than the one under Count VII.  That count is under the exclusive jurisdiction of the federal courts; a bankruptcy judge has the power to hear, determine, and order final judgment on it.[26]  As to Counts I - VI, however, the case for discretionary abstention is so strong that those counts should proceed in the Minnesota court, if they are to proceed.

---

[26]This comes about from the interaction of several federal statutes.  In pertinent part, 11 U.S.C. § 523(c)(1) provides:

> (1) . . . , the debtor shall be discharged from a debt of a kind specified in [11 U.S.C. § 523(a)] (6) . . . , unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under [11 U.S .C. § 523(a)] (6) . . . .

Here, "the court" obviously signifies the court with original jurisdiction over the bankruptcy case, i.e. the federal trial court.  That would be the bankruptcy court, the repository of judicial authority on reference from the district court as the court of original jurisdiction.  *See* 28 U.S.C. §§ 1334(a) - (b) (vesting original jurisdiction over bankruptcy cases and proceedings in the federal district court); 28 U.S.C. § 157(a) (empowering district court to refer all bankruptcy cases and proceedings to the district's bankruptcy judges, who constitute the district's bankruptcy court under 28 U.S.C. § 151); Loc. R. Bankr. P. (D. Minn.) 1070-1 (effecting the reference for the District of Minnesota).  A proceeding to determine the dischargeability of a particular debt is a core proceeding.  28 U.S.C. § 157(b)(2)(I).  Thus it is subject to final decision by a bankruptcy judge.  28 U.S.C. § 157(b)(1).

**ORDER OF PROCEEDINGS**

That "if" triggers the next question: should Count VII be tried first, here, before discretionary abstention might even be activated? Or should it first be determined as a matter of state law whether the Plaintiff incurred an "injury" at the Defendant's doing, and suffered harm with measurable consequences quantifiable in damages, before the parties come back to the forum of bankruptcy to determine the dischargeability of any debt so adjudicated?

There is no "correct" answer to these questions. The substantive and procedural considerations cut both ways.

Particularly in the early years after the Bankruptcy Code's enactment, most bankruptcy judges opted for the former. That approach came out of a generalized deference to a "fresh start" philosophy favoring debtor relief, which was perceived as being deeply immured in the Code. It was also considered preferable to use the more controlled forum of bankruptcy first, to determine whether the debtor had committed misconduct with culpable intent in creating the subject debt so as to except it from discharge. The idea there was that this forum would structure a more circumscribed, less burdensome, and less expensive process of litigation and trial. The goal, in part, was to save debtors (and their creditor-opponents) the expense of broader litigation on liability and damages under non-bankruptcy law in those cases where the sanction of nondischargeability was not warranted.

This thought was all very noble in its rehabilitative ethos. The matter is definitely more complicated than that, however. The service of a pro-rehabilitation, cost-minimizing policy in the context of bankruptcy does not always prevail as a value in scenarios that involve sharp controversy between complex factual narratives and more ambiguity as to the ultimate character of a debtor's conduct. More nuance is required as to the order of suit in such a situation. This is particularly so where both causes of action share the fact-issue of injury--its infliction, its intentionality, its consequences--and that entails the same complicated evidence and similar legal analysis.

21

That is the situation here.  Whether the Defendant even defamed the Plaintiff or tortiously invaded his privacy in a fashion to cause him measurable harm, is sharply contested between these parties.  It promises to be a complicated thing.  The Plaintiff may call 20 to 25 witnesses on the issue.  The Defendant does not plan now to do quite that, but she may have to.  An equally involved issue is posed for the causality element--i.e., between injury to reputation and resultant harm to business interests and personal standing.  Both of these inquiries would be relationship-driven.  Under the Plaintiff's pleading those relationships would all be personal.[27]  This most likely entails proof going to multiple relationships, before a threshold of materiality would be reached for fact-finding on harm and damages.

It would not be appropriate to relegate either side to separate, independent, and serial processes of trial and submission on issues so common or closely-cognate as these.  A determination under state law should be made first in time, given the Plaintiff's theories of suit and the multiple sensitivities discussed earlier.  If the Plaintiff is granted judgment there, it will settle a liability for a debt, i.e. that the Defendant owes a debt to the Plaintiff due to tortious conduct on her part, and how much that debt is.  If the Plaintiff prevails on those points, the parties then may take up the issue of dischargeability, back in this court.

In their argument and briefing, both sides made much of "judicial economy"--their more insistent point being that it would be oh, so economical to have one trial in the bankruptcy court.  As a fallback not enthusiastically endorsed, they say it would be better to try dischargeability here first, to reduce the chance of having to twice go through "the same trial" on a plenary basis.

These arguments, however, were founded far more on one notion of potential economies for the parties.  They take no heed of one significant possible savings in the

---

[27]Whatever it is that a particular "consultant" does day-to-day and job-to-job, it all is a matter of giving personal advice that would be heard, evaluated, trusted, and relied on by individual persons.  Here, the Plaintiff asserts that the acts of the Plaintiff in issuing *The Narcissist's Wife* eventually "resulted in his software company . . . losing a contract with Mayo Clinic."  In denying the Defendant's motion for summary judgment, the state court obviously thought that there was a triable fact issue on this aspect of his lawsuit. State Court Memorandum, 12.

transactional cost and burden of resolving their full dispute, for them and this court alike.  That lies

in the possible application of the preclusion doctrines.

        If proceedings in the state court are handled with some finesse, the trial on the

issues under state law may resolve more points of fact material to dischargeability than just the

infliction of an injury.  Specific intent of some sort is generally an element at issue in a cause of

action for intentional tort; it definitely is implicated for a claim for punitive damages under Minnesota

state law; and it obviously is central to a claim for nondischargeability under § 523(a)(6).  Issue

preclusion, or collateral estoppel, comes to the fore when the parties to a dischargeability

proceeding under § 523(a)(6) have tried a tort lawsuit under non-bankruptcy law to conclusion.

Collateral estoppel lies in dischargeability litigation, so as to preclude parties from relitigating

specific issues of law and fact previously adjudicated in litigation between the same parties but in

another judicial forum.  *E.g.*, *Grogan v. Garner*, 498 U.S. 279, 285 n.11 (1991); *Brown v. Felsen*,

442 U.S. 127, 139 (1979); *In re Porter*, 539 F.3d 889, 894 (8th Cir. 2008); *In re Miera*, 926 F.2d 741,

743 (8th Cir. 1991).  As long as the issues of fact are identical under the separate framings of

governing law, the findings from a prior judicial decision can bind a party in a later-commenced

proceeding in a bankruptcy case.  *Brown v. Felsen*, 442 U.S. at 139 n.10.  *See also In re Duy*, 484

B.R. 742, 747 n.7 (Bankr. D. Minn. 2012) (noting second element of collateral estoppel under

framing in cited opinions of both Minnesota Supreme Court and Eighth Circuit Court of Appeals,

"that the issue in question in the second suit is the same as the one on which a finding was made

in the first.").  This doctrine could have its utility on a return to this court, if the Plaintiff wins in the

Olmsted County District Court.

        The application of collateral estoppel in the dischargeability context can be

problematic if the enunciations as to required intent are not identically-worded in governing

precedent for the two separate proceedings.  It can also be troublesome if the wording or other

memorialization of earlier findings on intent is not in pinpoint-accord with the enunciation in the law

that governs the second proceeding where collateral estoppel is invoked.  Nonetheless, collateral

estoppel can come to bear even where the fact-finding process in an earlier proceeding was not

consciously structured in mind of its possible materiality to a later bankruptcy process.  *In re Duy*, 484 B.R. at 748; *In re Langeslag*, 366 B.R. 51, 59 (Bankr. D. Minn. 2007).

Fortuitously for the matter at bar, the parties are ahead of the end-point in the first proceeding, the circumstance that made the analysis in *Duy* and *Langeslag* so difficult.  Here, a carefully-structured fact-finding process in a lawsuit in the Olmsted County District Court could narrow or resolve such ambiguities up-front, by tailoring the inquiries and findings there to serve future needs as well as current ones.  It may be possible to do this through jury instructions, answers to special interrogatories, or judicial fact-finding.  If findings responsive to the relevant principles of dischargeability under bankruptcy law could be made in the state court without exceeding the state court's authority or going beyond its proper function in applying its own law, such findings could be set up for the making there.  If this were done, it would save litigation-anew on a return to the forum of bankruptcy.  This could reduce later burden to the parties and this judicial institution alike.[28]

If the state court could not defensibly produce findings with a match to bankruptcy law's requirements, trial there at least might narrow the issues on specific intent that would have to be re-presented to the bankruptcy court, or otherwise streamline the process of evidentiary presentation.  The principal proof on intent would of course come from the Defendant herself, and those who could offer direct evidence on her state of mind such as statements to third parties, acts reflecting her intent, and the like.  For such avenues of proof, the parties would have had the benefit of a previously airing on the submission of cognate issues under state law in the Olmsted County District Court.  They would have had an opportunity to gauge the credibility and probity of both sides' proof, and to evaluate whether to include particular parts of it anew for a case on dischargeability.  In this way the exercise on willfulness and malice under bankruptcy law could be made more straightforward and effective after a trial on the plenary issues under state law--even

---

[28]Not coincidentally, this would be a way for the state court to give some deference in return, in a functional sense.

if the components of a decision in the state court did not drive the outcome on dischargeability

through the bar of preclusion.

So, the Plaintiff and the Defendant will now return to the Olmsted County District

Court via the vehicles of abstention, dismissal in part, and a structured and limiting directive, to take

their lawsuit to final judgment there.[29]   The claims sued out under Counts I - VI of the Plaintiff's

complaint here will no longer be pending before this court.   The lawsuit in Olmsted County will be

the vehicle to determine whether the Defendant is legally liable in tort to the Plaintiff, and what sort

of damages and injunctive relief the Plaintiff will receive if the Defendant is liable.   An outcome for

the Plaintiff on those matters would give him one part of his case for nondischargeability, the

predicate "injury."   The balance of his case would have to be presented here.   If the state court

determines that the Defendant is *not* legally liable to the Plaintiff, she will have the basis of a motion

for summary judgment in this adversary proceeding.   (After all, where no debt is owing there is

nothing to except from discharge in bankruptcy and a dischargeability proceeding can not be

maintained.)   If the Defendant is held liable, Count VII will go forward before the bankruptcy court.

Finally, to make it clear to the Plaintiff and his attorney: so long as the Defendant's

bankruptcy case is pending, any judgment for recovery of money that is rendered in the Olmsted

County lawsuit is not to be enforced unless and until this court determines the debt to be

nondischargeable.   If before that the Plaintiff went ahead to collect on any money judgment from

the state court, and the Defendant ultimately won on dischargeability, the upshot could be

unfortunate for both parties.   The debt adjudicated might have been discharged much earlier.   If so,

the Defendant would have lost property through the Plaintiff's enforcement of a discharged debt.

And thus, the Plaintiff would have violated the discharge injunction of 11 U.S.C. §§ 524(a)(2) - (3).

---

[29]As a formal process, remand under 28 U.S.C. § 1452(b) is often dispensed in tandem with abstention under 28 U.S.C. § 1334(c), when a corollary proceeding was pending in a non-bankruptcy forum.   *In re Fifty Below Sales & Marketing, Inc.*, 490 B.R. 885, 891 (Bankr. D. Minn. 2013).   However, remand only applies when the proceeding in the non-bankruptcy forum had itself been *removed to* the bankruptcy court, wholesale or not, pursuant to 28 U.S.C. § 1452(a).   *Id.*   As noted, removal was not the process through which the Plaintiff's claims under state law came before the bankruptcy court.   Rather, the Plaintiff repled them in their entirety to a separate, parallel lawsuit that then was pending at the same time as the original.

*Venture Bank v. Lapides*, 800 F.3d 442, 447 (8th Cir. 2015).  The Plaintiff would be subject to

sanctions for that violation, to make the Defendant whole.  *In re Atkins*, 176 B.R. 998, 1006 (Bankr.

D. Minn. 1994).  As perverse as all that might seem from the perspective of state law and state legal

process, that would be the necessary result of the way these issues must be administered under

the lock-step processes of bankruptcy procedure.  *Supra*, 5, n.9.[30]

So, to make it clear to the Plaintiff, a hold-in-place will be imposed on the

enforcement of any money judgment he may obtain in the Olmsted County District Court, until the

bankruptcy court takes up its function again and determines dischargeability.  In the meantime, the

state court's preliminary injunction is to be given full deference and treated as enforceable.  If the

Plaintiff prevails after trial in Olmsted County and a permanent injunction is issued, the effect of a

determination on dischargeability for any continuing injunctive restraint can be addressed to this

court when Count VII is submitted for decision.

## ORDER

IT IS THEREFORE ORDERED:

1.    This court abstains from hearing and determining all issues under Counts I -

VI of the Plaintiff's complaint in this adversary proceeding, pursuant to 28 U.S.C. § 1334(c)(1).

2.    Counts I - VI are dismissed from this adversary proceeding, but not on their

merits and only in consequence of the abstention under Term 1.  The Plaintiff and the Defendant

shall proceed to litigate and to obtain decision on all such claims that are presently pending in the

lawsuit between them in the Olmsted County, Minnesota District Court.  Neither 11 U.S.C. § 362(a)

nor 11 U.S.C. § 524(a) will bar them from doing so.

---

[30]These observations are not phrased with any finality as to the effect of discharge, because an order granting the Defendant a discharge has not yet been entered in BKY 14-34936.  The apparent reason is that the trustee of her bankruptcy estate has not yet certified that the meeting of creditors has concluded.  The docket is opaque as to the reasons for that.  But regardless, the Defendant has not yet received a discharge, and it cannot be said that she will--even though no party timely objected to discharge under 11 U.S.C. § 727(a) and even though the Defendant has satisfied at least one of the post-petition requisites, the completion of a course of financial management education, 11 U.S.C. §§ 111 and 727(a)(11).

3.      Further proceedings on Count VII of the Plaintiff's complaint in this adversary proceeding will be held in abeyance pending entry of final judgment in the Olmsted County District Court.

4.      Counsel for the Plaintiff and the Defendant shall file joint reports to this court of the status of the state-court litigation on the first of the month, once every six months starting December 1, 2015.  They shall file those reports until final judgment is entered there or until the parties have reached settlement.

5.      If the Olmsted County District Court renders a judgment for money damages in favor of the Plaintiff, the Plaintiff shall not take any act, action, proceeding, or remedy to collect that judgment under the laws of the State of Minnesota or any other forum, until this court has rendered final judgment on Count VII of his complaint in this adversary proceeding and such judgment is in the Plaintiff's favor.

6.      The restraint under Term 5 shall not lie against the enforcement of any final injunctive relief in favor of the Plaintiff granted by the Olmsted County District Court.  The viability of such enforcement under bankruptcy law is expressly reserved, and may be raised by either party by motion at any time before final judgment is entered in this adversary proceeding.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE

27